Mary Elizabeth Heard
Texas State Bar No. 24096727
SD # 2943737
Email: meheard@grablemartin.com
Grable Martin PLLC
7700 Broadway St., Suite 104 PMB 308
San Antonio, Texas 78209
Telephone: (210) 572-4925
*Counsel for Persimmon BridgeCo, LLC*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| IN RE: | § | |
|--------|---|---|
| | § | **Chapter 11** |
| **ZD SAND, LLC,** | § | |
| | § | **Case No. 26-32398 (JPN)** |
| **Debtor.** | § | |

**PERSIMMON BRIDGECO, LLC'S AMENDED EMERGENCY MOTION FOR
SANCTIONS AND TO DISMISS CHAPTER 11 CASE OR, IN THE ALTERNATIVE, TO
CONVERT CASE TO CHAPTER 7, OR APPOINT A CHAPTER 11 TRUSTEE
PURSUANT TO 11 U.S.C. §§ 105, 1104, AND 1112(b)**

*[Relates to Dkt. Nos. 4, 7, 8, 13, 14, 15, 24, 26, 34, 41, 46, 47, 53, 61, 62, 63, 67 & 77]*

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.

**TO THE HONORABLE JEFFREY P. NORMAN, UNITED STATES BANKRUPTCY JUDGE:**

**EMERGENCY CONSIDERATION**

Persimmon BridgeCo, LLC ("Persimmon" or "Lender") respectfully requests expedited consideration under Bankruptcy Local Rule 9013-1(i), and that this Motion be heard as soon as possible because Debtor's conduct includes violations of multiple Court orders.  Lender and the Debtor will likely need to prepare for depositions and incur further costs for same and for preparing and appearing at the hearing on use of cash collateral set for May 22, 2026 [Dkt. 47].   Emergency consideration is warranted for four independent reasons: (i) the estate is being actively depleted by an undersecured Debtor whose Managing Member has been documented receiving unauthorized cash transfers since the Petition Date; (ii) the Debtor has defied multiple orders issued by this Court; (iii) the cash collateral that has been used by the Debtor in defiance of multiple Court orders and cannot be replaced; and (iv) Persimmon has filed this Motion as soon as practicable after reviewing the Debtor's April bank statements that document the violations described herein. Furthermore, Persimmon is mindful of the Court's direction in the Order on the Motion to Quash [Dkt. No. 67] entered yesterday morning.  Persimmon just received the appraisal, and it has not yet had time to analyze it, nor prepare its witness. Should the Court decide to extend the terms of the Interim Cash Collateral Order for a few weeks, Persimmon and the Debtor will work out a deposition schedule that suits all parties. However, Persimmon asks that the Court rule on this Motion for Sanctions / Dismissal / Conversion / Appointment of chapter 11 trustee in advance of what will likely be a costly

litigation process.  If this case is to be dismissed or converted, it does not make sense for all parties to continue to incur costs in this bankruptcy case.

Persimmon, the Debtor's senior secured lender, respectfully moves this Court for entry of an order (i) imposing sanctions under 11 U.S.C. § 105(a) and the Court's inherent power for the Debtor's violations of this Court's prior orders; and (ii) dismissing this chapter 11 case under 11 U.S.C. § 1112(b); or, in the alternative, (iii) converting this case to chapter 7; or, in the further alternative, (iv) appointing a chapter 11 trustee under 11 U.S.C. § 1104(a).  In support, Persimmon respectfully states as follows:

## PRELIMINARY STATEMENT

1.      This case has been pending for forty-one days. In that time, the Debtor has violated almost every operating restriction this Court imposed at the outset of the case. Between April 6 and April 30, 2026, the Debtor disbursed more than $1.2 million of Persimmon's cash collateral, without consent and without authorization, in direct violation of the Order to Debtor-in-Possession ("DIP Order") [Dkt. 4] and the explicit limitation in the Wages Order [Dkt. 8]. The Debtor paid an affiliated trucking entity, ZD Trucking, LLC $153,062 despite having been instructed not to pay insiders in the Wages Motion. The Debtor wrote counter checks payable to its Managing Member Wesley Andrews totaling $42,510. The Debtor diverted $108,306 in ACH debits labeled "PAYROLL" to an undisclosed destination that did not credit its represented payroll account.  The Debtor honored at least seven pre-petition checks. The Debtor paid more than $293,000 in pre-petition critical-vendor balances before this Court authorized any critical vendor payment, and a further sum in excess of $177,000 to non-designated vendors on pre-petition obligations. The Debtor exceeded the ultimately authorized 25% caps by more than $105,000 net of

the duplicate-payment refund described below. The Debtor paid Amigo Energy and other utility providers in excess of the Court-authorized adequate-assurance amounts.

2.      Most of this conduct continued after the April 20 Denial Order [Dkt. 15], in which this Court denied emergency consideration of the Cash Management Motion and made plain that no interim authority existed. The largest single vendor payment of the month (Aggregate Haulers, $89,452, April 27); two of the four ZD Trucking payments ($101,841 combined, April 23 and April 30); the $26,000 counter check payable to Mr. Andrews (April 29); the second $55,664 "PAYROLL" ACH diversion (April 23); and most of the Rollo Insurance debits all cleared after April 20.

3.      The DIP Order [Dkt. 4] itself warned the Debtor: ***"Failure to abide by this order may lead to sua sponte dismissal or conversion of this case."*** (emphasis added). The Debtor proceeded to ignore the order anyway. The relief Persimmon now seeks is the relief the Court itself prescribed: sanctions for the violations, and dismissal of the case, conversion to chapter 7, or appointment of a chapter 11 trustee.

4.      Four "cause" grounds in 11 U.S.C. § 1112(b)(4) are present: (i) substantial and continuing diminution of the estate (§ 1112(b)(4)(A)); (ii) gross mismanagement (§ 1112(b)(4)(B)); (iii) unauthorized use of cash collateral substantially harmful to a creditor (§ 1112(b)(4)(D)); and (iv) failure to comply with orders of the Court (§ 1112(b)(4)(E)). Cause for appointment of a chapter 11 trustee under § 1104(a)(1) is also satisfied: the Debtor's post-petition representations to this Court about its bank account structure were false when made, and the Debtor's post-petition payments to its Managing Member by counter check were a continuation of a pre-petition practice of unreported insider distributions.

5.      Persimmon requests, in order of preference, (a) dismissal under § 1112(b), which would lift the automatic stay and permit Persimmon to complete the foreclosure that the bankruptcy filing was timed to delay; (b) conversion to chapter 7, which would place a fiduciary in control with statutory avoidance powers to recover the unauthorized transfers; or (c) appointment of a chapter 11 trustee under § 1104(a), which would at least remove current management.  Persimmon further requests that the Court impose sanctions under 11 U.S.C. § 105(a) and the Court's inherent power for the Debtor's repeated and continuing violations of this Court's orders.

6.      Persimmon incorporates by reference its Objection to the Critical Vendor Motion [Dkt. 26]; its Supplemental Objection to the Critical Vendor Motion [Dkt. No. 62]; its Limited Objection to the Cash Collateral Motion [Dkt. 41]; its Response to Debtor's Emergency Motion to Withdraw Critical Vendor Motion [Dkt. No. 63] and its Objection to the Cash Management System [Dkt. No 56]. All arguments concerning the validity, priority, extent, perfection, enforceability, and proceeds of Persimmon's liens are preserved, including Persimmon's right to determine lien validity and proceeds issues through an adversary proceeding under Bankruptcy Rule 7001(b).

## JURISDICTION AND VENUE

7.      The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).  Venue is proper under 28 U.S.C. §§ 1408 and 1409.  Persimmon is a party in interest under 11 U.S.C. § 1109(b). Standing to seek dismissal or conversion under § 1112(b), and to seek appointment of a trustee under § 1104(a), is expressly granted to a "party in interest." 11 U.S.C. §§ 1104(a), 1112(b)(1).  The statutory bases for the relief requested are 11 U.S.C. §§ 105(a), 1104,

and 1112(b); Federal Rules of Bankruptcy Procedure 9014 and 9020; and the Court's inherent power to enforce its own orders.

## FACTUAL BACKGROUND

### A. Persimmon's Loans and Collateral.

8.      On or about March 12, 2024, Persimmon made three loans to the Debtor totaling $7,500,000.00 in original principal, each secured by a recorded deed of trust encumbering approximately 944 acres of sand-bearing land in McCulloch County, Texas (the "Properties").  All three deeds of trust were executed by Wesley Andrews as Managing Member of ZD Sand, LLC. *See* Persimmon's Objection to Critical Vendor Motion [Dkt. 26] ¶ 10 & Exs. A, B, C and recorded deeds in the Witness and Exhibit List dated May 8, 2026 [Dkt. No. 53 and 53-2; 53-3; 53-4].  Each deed of trust expressly names sand among the collateral. By operation of UCC §§ 9-102(a)(6), 9-315, and 11 U.S.C. § 552(b), the Debtor's cash receipts from sand sales are Persimmon's perfected cash collateral.

9.      Based on the most recent appraisal report as of the date of this Motion, Persimmon is significantly undersecured.  The McCulloch County tax appraisal values the Properties at $5,462,620.00 against $7,500,000.00 in original principal plus accrued interest.  Every dollar of unauthorized disbursement reduces Persimmon's recovery dollar-for-dollar.

10.      The Debtor filed its voluntary chapter 11 petition on April 6, 2026 (the "Petition Date") on the eve of a long-noticed foreclosure sale scheduled for April 7, 2026. The Debtor has previously postponed Persimmon's foreclosure multiple times.

**B. The Court's Orders the Debtor Has Violated.**

11.     On April 7, 2026, the Court entered its *Order to Debtor-in-Possession* [Dkt. 4] (the "DIP Order"). The DIP Order ¶ 1 required the Debtor to "close all existing bank accounts" and open new debtor-in-possession accounts. ¶ 5 prohibited payment of "any debt incurred before the petition was filed" without specific authorization. ¶ 6 prohibited use of cash collateral without consent or Court authorization and required cash collateral to be "deposited in a separate account" under the Bank's control. ¶ 8 required that ordinary course operations be conducted in a manner that does not deplete the estate. ¶ 10 required the Debtor to file monthly operating reports. The DIP Order concluded with the express warning: "Failure to abide by this order may lead to sua sponte dismissal or conversion of this case."

12.     On April 9, 2026, the Court entered an order on the Wages Motion [Dkt. 8] (the "Wages Order") that authorized only the payment of pre-petition wages within the priority limits of § 507(a)(4) and expressly stated: "This order does not grant authority to spend cash collateral."

13.     On April 20, 2026, the Court entered an order (the "April 20 Denial Order") [Dkt. 15] denying emergency consideration of the Debtor's Cash Management Motion, finding that no emergency existed, and setting that motion for hearing on May 19, 2026. The April 20 Denial Order put the Debtor on indisputable notice that no interim authority existed to operate outside the DIP Order.

14.     On April 23, 2026, the Court entered the Utility Order [Dkt. 24], authorizing the Debtor to make adequate assurance deposits totaling only $620 ($600 to Amigo Energy and $20 to Discount Power).

15. On May 1, 2026, the Court entered the Interim Critical Vendor Order [Dkt. 46] (the "Interim CV Order"), authorizing the Debtor (but not requiring it) to pay 25% of capped pre-petition amounts to four named vendors: Sun Coast Resources (cap $14,123.16); Aggregate Haulers (cap $90,058.71); Cisco Equipment (cap $12,644.38); and Excel Machinery (cap $16,148.78). The Court also entered the Interim Cash Collateral Order [Dkt. 47] (the "Interim CC Order") on May 1st, granting the first authority to use cash collateral.  The nature of relief in each order is prospective.

## C. The Debtor's Post-Petition Disbursements.

16. Persimmon has reviewed the Debtor's April 2026 statements for both Cadence Bank accounts: Operating Account #9173 and "Payroll Account" #9181. The detail of each material category of unauthorized disbursement follows.

### 1. $153,062 to Affiliated Entity ZD Trucking LLC.

17. Between April 6 and April 30, 2026, the Debtor issued four checks payable to ZD Trucking LLC totaling $153,062.34: Check No. 1357 (dated 4/3/2026, cleared 4/6/2026, $49,155.46); Check No. 1360 (dated 4/5/2026, cleared 4/20/2026, $2,065.94); Check No. 1361 (dated 4/22/2026, cleared 4/23/2026, $54,593.84); and Check No. 1356 (dated 4/28/2026, cleared 4/30/2026, $47,247.10). On information and belief, ZD Trucking LLC is owned, controlled by, or affiliated with Mr. Andrews, making the entity an insider of the Debtor under 11 U.S.C. § 101(31)(B) and (E). The Debtor has not disclosed the relationship in its Schedules or any motion before this Court. No order authorizes insider payments of any size.

### 2. $42,510 in Counter-Check Cash Withdrawals to Wesley Andrews.

18.     On April 13, 2026, the Debtor processed an over-the-counter "Checking Withdrawal" (Cadence internal-debit Check No. 999999) from the Payroll Account #9181 for $16,510.00 payable to Wesley Andrews. On April 29, 2026, the Debtor processed a second over-the-counter "Checking Withdrawal" (Check No. 999999) from the Operating Account #9173 for $26,000.00 payable to Wesley Andrews. The two transactions total $42,510 in direct cash payments to the Debtor's Managing Member. No order authorizes any payment to Mr. Andrews, in any amount, in any form. The April 29 payment cleared nine days after the April 20 Denial Order made clear that no interim authority existed.

### 3. $108,306 in "PAYROLL" ACH Debits to an Undisclosed Destination.

19.     On April 10, 2026, the Operating Account #9173 reflects an ACH debit described as "ZD SAND LLC PAYROLL" in the amount of $52,642.59, bearing originator identifier 1884064394 and trace number 524771908139310. On April 23, 2026, a second ACH debit with identical description, originator, and trace number type cleared in the amount of $55,663.55. Together: $108,306.14. Neither debit corresponds to any credit to the Payroll Account #9181, which the Debtor has repeatedly represented to be its payroll account.

20.     The Debtor knows precisely where these funds went. The pre-petition Cadence #9173 statements (every period from account opening on November 14, 2025 through March 31, 2026) reflect that the Debtor's actual payroll cleared the Operating Account via ACH bearing the same originator 1884064394, with descriptions including "INTUIT PAYROLL S 1722616679 / 884064394 QUICKBOOKS CCD" ($39,286.64 on January 29, 2026) and "ZD SAND LLC 1884064394 / PAYROLL CCD" ($36,978.46 on February 26, 2026; $43,105.70 on March 12, 2026; and $47,487.15 on March 26, 2026). Originator

1884064394 is the Debtor's established Intuit/QuickBooks payroll routing. The Debtor's post-petition silence about the destination of the two April "PAYROLL" ACH debits is an affirmative choice not to disclose information within its knowledge.

### 4. Honoring of Multiple Pre-Petition Checks.

21.    The DIP Order ¶ 1 required the Debtor to close its pre-petition bank accounts. The Debtor did not. As a direct result, numerous checks dated pre-petition cleared the Operating Account after the Petition Date, in violation of the automatic stay under 11 U.S.C. § 362(a)(3) and the DIP Order ¶ 5, including without limitation: Check No. 1103 ($641.60, dated 3/20/26); Check No. 1104 ($2,760.26, dated 3/31/26); Check No. 1105 ($281.14, dated 3/31/26); Check No. 1112 ($80.00, dated 4/2/26); Check No. 1357 ($49,155.46 to ZD Trucking, dated 4/3/26); Check No. 1358 ($4,931.82, dated 4/3/26); and Check No. 1360 ($2,065.94 to ZD Trucking, dated 4/5/26). These checks alone total $59,916.22 paid on pre-petition obligations. The Debtor's April statement reflects additional pre-petition-dated checks that likewise cleared post-petition.

### 5. Critical-Vendor Payments Exceeding Ultimately Authorized 25% Caps by $105,536 Net of Refund.

22.    Before the Interim CV Order was entered on May 1, 2026, and before any order authorized payment of pre-petition critical-vendor balances, the Debtor paid three of the four critical vendors more than the Court eventually authorized:

- **Sun Coast Resources.** Authorized 25% cap: $14,123.16. Paid pre-5/1: $43,026.99 ($18,026.99 ACH 4/6 + $25,000 ACH 4/24). Excess: $28,903.83.

- **Aggregate Haulers.** Authorized 25% cap: $90,058.71. Paid pre-5/1: $232,255.20 (Ck #1129 4/20 $71,401.77 + Ck #1122 4/21 $71,401.77 + Ck #1135 4/27 $89,451.66). Check Nos. 1129 and 1122 are identical in amount

and were issued on consecutive days; they constitute a duplicate payment. Aggregate Haulers itself recognized the duplicate and, on April 21, 2026, returned $71,407.77 to the Debtor by ACH credit bearing the notation "CUSTOMER REFUND FOR DUPLICA[TE]." Net of that refund, the amount Aggregate Haulers retained was $160,847.43. Each of the three checks was nonetheless an independent unauthorized post-petition transfer of cash collateral when made; for purposes of disgorgement, however, and crediting the refund already returned to the estate, the net amount received by Aggregate Haulers in excess of the 25% cap is $70,788.72.

- **Cisco Equipment.** Authorized 25% cap: $12,644.38. Paid pre-5/1: $18,488.22 (4/30/26). Excess: $5,843.84.

- **Excel Machinery.** Authorized 25% cap: $16,148.78. Paid pre-5/1: $0.00 reflected on April statement.

23. Aggregate unauthorized transfers in excess of the authorized caps total $176,944.16 measured by the gross amounts disbursed. Crediting the $71,407.77 duplicate-payment refund that Aggregate Haulers returned to the estate, the net amount the critical vendors received and retained in excess of the caps—and the amount subject to disgorgement—is $105,536.39 ($28,903.83 from Sun Coast Resources, $70,788.72 net from Aggregate Haulers, and $5,843.84 from Cisco Equipment). The Aggregate Haulers Check No. 1135 (4/27/26) and the Cisco Equipment payment (4/30/26) both cleared after the April 20 Denial Order.

### 6. Non-Critical Vendor Pre-Petition Obligations.

24.     The Debtor paid in excess of $177,000 on pre-petition obligations to vendors that were never designated critical vendors, including, without limitation: Rollo Insurance, $130,330.28 in five ACH debits (the largest two, $42,574 on 4/24 and $41,651 on 4/29, both after the April 20 Denial Order); equipment-finance creditors Financial Pacific, Deere Credit, CNH Industrial Capital, Priority Capital, Oakmont Capital, and Caterpillar Financial; Hudson Energy, $7,798.94; Central Power Systems, $14,531.48; Central Texas Telephone, $179.90; and Amigo Energy, $523.58 (beyond the $600 deposit-only authorization in the Utility Order [Dkt. 24]).

### 7. Conduct After the April 20 Denial Order.

25.     Approximately $574,000 in unauthorized disbursements cleared after April 20, 2026, after the Court denied emergency consideration of the Cash Management Motion: $89,451.66 to Aggregate Haulers (Check #1135 cleared 4/27); $54,594 to ZD Trucking (Check #1361 cleared 4/23); $47,247 to ZD Trucking (Check #1356 cleared 4/30); $26,000 counter check to Mr. Andrews (4/29); $55,664 "PAYROLL" ACH (4/23); $42,574 to Rollo Insurance (4/24); $41,651 to Rollo Insurance (4/29); $25,000 to Sun Coast (4/24); $18,488 to Cisco Equipment (4/30); plus various smaller debits.

## D. Continuity of the Insider Payment Pattern: Pre-Petition Context.

### 1. Cadence Accounts

26.     The post-petition payments to Mr. Andrews are not isolated. The Debtor's pre-petition Cadence Operating Account statements (every period from account opening on November 14, 2025 through March 31, 2026) reflect $160,000 in payments to Mr. Andrews between January 21, 2026 and March 24, 2026: six $10,000 checks (Check Nos. 1007, 1341, 1345, 1347, 1349, and 1355, the first five labeled "Payroll" on the memo

line); plus a $100,000 over-the-counter "Checking Withdrawal" (Check No. 999999) payable to Mr. Andrews on March 11, 2026. None of these payments appears on the Debtor's Statement of Financial Affairs at Question 4 (insider transfers within one year of filing) or Question 30 (insider compensation). The Debtor's actual W-2 payroll runs through Intuit/QuickBooks ACH, as set forth above. The post-petition $42,510 in counter-check payments to Mr. Andrews continues a pre-petition practice that the Debtor concealed from its Schedules.

### 2. Commercial National Bank

The Debtor had at least one account at Commercial National Bank ("CNB"). The statements for CNB account ending in #2800 reflect significant payments to insiders, including Wesley Andrews, some of which may not have been disclosed in the Schedules and Statements of Financial Affairs. Furthermore, there are many payments that appear to be for personal expenses instead of ordinary course payments for an aggregate mining business.

### 3. First United Bank

The Debtor had at least one account at First United Bank ("FUB"). The statements for FUB account ending in #5754 reflect significant payments to insiders, including Wesley Andrews, some of which may not have been disclosed in the Schedules and Statements of Financial Affairs. Furthermore, there are many payments that appear to be for personal expenses instead of ordinary course payments for an aggregate mining business. The same statements also reflect transfer activity with five other First United Bank account numbers (ending 0440, 5790, 5863, 5921, and 7036), the ownership of which has not yet been confirmed. Debtor's counsel reported to Persimmon's counsel

that these other accounts were not owned by the Debtor; however, Persimmon has not yet confirmed who or what owns these accounts.

**E. The Cash Management Motion's Representation Regarding the Payroll Account.**

27.     Paragraph 13 of the Cash Management Motion [Dkt. 13] and paragraph 13 of the Wages Motion [Dkt. 7] each represent to this Court that Cadence account #9181 is the Debtor's payroll account. The Debtor's own pre-petition bank statements demonstrate the representations were false when made. In 138 days of pre-petition existence (November 14, 2025 through March 31, 2026), Cadence #9181 had zero payroll transactions: no employee paycheck cleared the account; no Intuit/QuickBooks payroll ACH ran through it; no federal, state, or local payroll-tax remittance was paid from it; no employee-benefit premium or contribution cleared it; and no withholding remittance to the IRS or the Texas Workforce Commission cleared it. The complete pre-petition activity of #9181 was: a $1,000 opening deposit; five months of bank service charges; a rejected $200,000 transfer attempt on March 9, 2026; a $100,000 transfer in on March 11, 2026; and $55,000 in transfers out to #9173 in late March.

## ARGUMENT

**I.      The Debtor's Conduct Establishes Cause for Dismissal Under 11 U.S.C. § 1112(b).**

28.      Section 1112(b)(1) provides that, on request of a party in interest, the Court *"shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause"* unless the § 1112(b)(2) exception applies. "Cause" is enumerated non-exhaustively in § 1112(b)(4). Each of the four grounds set forth below is independently present.

### A. Substantial Loss to and Diminution of the Estate — § 1112(b)(4)(A).

29.      More than $1.2 million in cash collateral was disbursed without authority in the first 25 days of this case. Persimmon is significantly undersecured. Every dollar of unauthorized disbursement is a permanent reduction in the estate's ability to satisfy Persimmon's secured claim. There is no reasonable likelihood of rehabilitation when the Debtor is paying insiders, affiliates, and pre-petition vendors out of secured collateral while paying its lender nothing.

### B. Gross Mismanagement — § 1112(b)(4)(B).

30.      Under § 1112(b)(4)(B) "gross mismanagement of the estate" is cause for dismissal or conversion.  "A debtor in possession is vested with significant power under the Bankruptcy Code and that power comes with certain responsibilities. A debtor in possession owes a fiduciary duty to its creditors. Gross mismanagement is a breach of that duty.  Simple mismanagement is insufficient for a finding of gross mismanagement

of the estate, but simple misconduct can collectively demonstrate gross mismanagement of the estate." *In re Turkey Leg Hut & Co. LLC*, 665 B.R. 129, 140 (Bankr. S.D. Tex. 2024). No reasonable fiduciary would have permitted: direct counter-check cash withdrawals to the Managing Member; payments to an affiliated trucking entity totaling $153,062; the diversion of $108,306 in "PAYROLL" ACH debits to an undisclosed destination using the same routing as pre-petition payroll; the honoring of pre-petition checks; the payment of more than $105,000 net over the ultimately authorized critical vendor caps; or the continued unauthorized disbursements after the April 20 Denial Order made clear that no interim authority existed. The disbursements were of assets of the estate. Unauthorized disbursements to insiders and pre-petition unsecured creditors constitutes gross mismanagement. *See In re M.A.R. Designs & Constr., Inc.*, 653 B.R. 843 , 857 (Bankr. S.D. Tex. 2023).

### C. Unauthorized Use of Cash Collateral — § 1112(b)(4)(D).

31. Section 1112(b)(4)(D) enumerates as cause "unauthorized use of cash collateral substantially harmful to 1 or more creditors." The use was unauthorized; the harm to Persimmon is substantial; and Persimmon's significantly undersecured position confirms the harm is real, not speculative. This subsection is dispositive on its own.

### D. Failure to Comply With Orders of the Court — § 1112(b)(4)(E).

32. Under § 1112(b)(4)(E), "failure to comply with an order of the court" is cause for dismissal or conversion. "A debtor has the obligation to strictly abide by the bankruptcy court's orders." *In re Turkey Leg Hut & Co. LLC*, 665 B.R. 129, 140 (Bankr. S.D. Tex.

2024). Section 1112(b)(4)(E) embodies that principle. "Cause to convert pursuant to § 1112(b)(4)(E) exists if a debtor fails to comply with a single order; a pattern of non-compliance is not required by the statute." *Id.* Section 1112(b)(4)(E) does not require a debtor's non-compliance to be willful, in bad faith, or fraudulent. *Id.* The Debtor violated multiple paragraphs of the DIP Order; the express limitation in the Wages Order [Dkt. 8] ("This order does not grant authority to spend cash collateral"); and the April 20 Denial Order [Dkt. 15]. The Debtor also exceeded the $620 adequate-assurance limit set by the Utility Order [Dkt. 24]. The Court's own warning in the DIP Order applies in terms: failure to abide may lead to sua sponte dismissal or conversion of the case.

**II. The Court Should Alternatively Appoint a Chapter 11 Trustee for Cause Under 11 U.S.C. § 1104(a).**

33.     Section 1104(a)(1) requires appointment of a trustee for cause, *"including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case."* Both prongs are satisfied here.

34.     **Dishonesty.** The Cash Management Motion (¶ 13) and Wages Motion (¶ 13) each represented to this Court that Cadence #9181 is the Debtor's payroll account. The Debtor's own pre-petition bank statements demonstrate those representations were false when made. The Debtor also concealed from its Statement of Financial Affairs approximately $160,000 in pre-petition payments to its Managing Member that continued in the same form post-petition. A debtor that misrepresents its bank account structure to the Court overseeing its case, and that conceals insider distributions from its sworn schedules, cannot continue as a fiduciary for the estate.

35.     **<u>Incompetence and gross mismanagement</u>**. Independent of any dishonesty finding, the post-petition record alone establishes cause: more than $1.2 million in unauthorized disbursements in 25 days; more than $105,000 net in critical-vendor overpayments before any critical-vendor order existed; honoring of pre-petition checks in violation of § 362(a) and DIP Order ¶ 5; payments to insiders and affiliates with no authorization; and continued violations after the April 20 Denial Order. No competent fiduciary administers an estate this way.

36.     Section 1104(a)(2) provides an alternative basis: the Court "shall order the appointment of a trustee . . . if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate." Given the documented dissipation of cash collateral and the Debtor's continuation of unauthorized conduct after the April 20 Denial Order, appointment of a trustee is necessary to protect all interests.

## III.     The Appointment of a Chief Restructuring Officer Does Not Cure the Cause for Relief Under § 1112(b).

37.     The Debtor will likely contend that its retention of a Chief Restructuring Officer ("CRO") renders the relief sought herein unnecessary. That argument should be rejected. A CRO is not a substitute for the remedies expressly authorized by § 1112(b), and the existence of a CRO is not a defense to a properly supported motion to dismiss, convert, or appoint a chapter 11 trustee. *First*, a CRO is not a statutory officer of the estate. Unlike a chapter 11 trustee, a CRO is retained by, reports to, and serves at the pleasure of existing management and the board—the very fiduciaries whose conduct gives rise to the cause shown above. A CRO owes no independent statutory fiduciary duty to the estate or creditors that overrides her contractual obligations to the Debtor, and is not subject to

the qualification, bonding, and disinterestedness requirements of §§ 321–322. Nor is a CRO selected through the supervised process of § 1104(d).  A CRO may be terminated by the Debtor at any time, whenever her recommendations become inconvenient.  The scope of the CRO's authority is defined entirely by the engagement letter the Debtor itself negotiates. *Second*, the cause established by Lender herein is not the kind of harm a consultant can remedy. These are structural failures of governance and fiduciary stewardship that demand an independent fiduciary answerable to the Court, not an advisor answerable to the Debtor. The Fifth Circuit has made clear that "cause" under § 1104(a)(1) reaches structural conflicts and failures of fiduciary stewardship that demand an independent fiduciary, not merely additional advice rendered within the same governance structure that produced the harm. *See In re Cajun Elec. Power Coop., Inc.*, 74 F.3d 599 (5th Cir. 1996) (*en banc* decision affirming appointment of chapter 11 trustee under § 1104(a)(1) where structural conflicts within the debtor's governance warranted independent fiduciary). *Third*, courts have repeatedly recognized the categorical distinction between a CRO and a trustee: a trustee replaces management and the board and owes statutory duties directly to the estate; a CRO does not. *See, e.g., In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 668 (Bankr. S.D.N.Y. 2006).  Permitting a debtor to defeat a § 1112(b) motion by hiring a consultant, particularly where, as here, the CRO's engagement postdates the misconduct, leaves existing management in place, and does not divest the board of decision-making authority would allow debtors to substitute self-selected advisors for the Code's express remedial scheme and would effectively read the trustee remedy out of § 1112(b)(1). The appointment of a CRO may be a useful supplement to good governance; it is not a cure for its absence. Lender's request must

be evaluated on the record of the Debtor's conduct and the statutory factors, not on the Debtor's eleventh-hour retention of a professional whose tenure and authority remain entirely within the Debtor's control. The CRO may be a useful supplement to good governance; however, she is not a cure for its absence.

**IV. The Court Should Impose Sanctions for Violation of Its Orders.**

38.     Independent of dismissal, conversion, or trustee appointment, this Court has both statutory and inherent authority to sanction the Debtor for its repeated and continuing violations of the DIP Order, the Wages Order, the April 20 Denial Order, and the Utility Order. Section 105(a) authorizes the Court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. The Supreme Court has held that bankruptcy courts may impose civil contempt sanctions under § 105(a) for violations of court orders. *See Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019). Federal Rule of Bankruptcy Procedure 9020 makes Federal Rule of Bankruptcy Procedure 9014 governing contested matters applicable to motions for civil contempt. The Court's inherent power to enforce its own orders is also long-established. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–46 (1991). "[I]t is firmly established that the power to punish for contempts is inherent in all courts. This power reaches both conduct before the court and that beyond the court's confines, for the underlying concern that gave rise to the contempt power was not . . . merely the disruption of court proceedings. Rather, it was disobedience to the orders of the Judiciary, regardless of whether such disobedience interfered with the conduct of trial." 501 U.S. at 44 (internal citations omitted).

39.     The standard for civil contempt is satisfied where there is "no fair ground of doubt" as to whether the order barred the conduct in question. *Taggart*, 587 U.S. at 557. Here,

there is no fair ground of doubt.  DIP Order ¶ 5 prohibits payment of pre-petition debt. The Debtor paid pre-petition debt. DIP Order ¶ 6 prohibits use of cash collateral without authorization. The Debtor used cash collateral without authorization. The Wages Order expressly stated that it "does not grant authority to spend cash collateral." The Debtor spent cash collateral. The April 20 Denial Order denied emergency consideration of the Cash Management Motion. The Debtor continued unauthorized disbursements anyway. Furthermore, the Debtor had already spent more than what the Court ultimately allowed in the Interim CV Order.  As of the date of the May 1 hearings on the Cash Collateral Motion and the Critical Vendor Motion (which had been continued from Monday April 27th), the damage had already been done.  There is no way to get that cash back unless the Court takes action.

40.     Persimmon respectfully requests that the Court impose the following sanctions:

> **(a) Disgorgement.** Disgorgement of (i) the $42,510 in counter-check cash payments to Wesley Andrews from Mr. Andrews personally; (ii) the $153,062.34 paid to ZD Trucking LLC from that entity and, jointly and severally, from Mr. Andrews to the extent he received the funds directly or indirectly; (iii) the $105,536.39 net in critical-vendor overpayments (crediting the $71,407.77 duplicate-payment refund already returned to the estate—$28,903.83 from Sun Coast Resources, $70,788.72 net from Aggregate Haulers, and $5,843.84 from Cisco Equipment) from the recipient vendors under 11 U.S.C. § 549(a) and the Court's inherent power; and (iv) the $59,916.22 in pre-petition checks honored post-petition, together with any additional pre-petition-dated checks honored post-petition that are established at the hearing, from the recipient payees.

**(b) Per diem coercive sanctions.** A coercive per-diem monetary sanction against the Debtor and against Mr. Andrews personally for each day of continued non-compliance with the DIP Order, beginning the date of entry of the sanctions order and continuing until full compliance is achieved, including production of all bank records and identification of the recipient of the $108,306.14 in "PAYROLL" ACH debits.

**(c) Attorney's fees.** Persimmon's reasonable attorney's fees and costs incurred in bringing this Motion, the Limited Objection to the Cash Collateral Motion [Dkt. 41], the Objection to the Critical Vendor Motion [Dkt. 26], the Supplemental Objection to the Critical Vendor Motion [Dkt. 62], and the Response to the Emergency Motion to Withdraw the Critical Vendor Motion [Dkt. 63], payable from estate assets and, jointly and severally, from Mr. Andrews personally.

**(d) Show-cause order.** An order requiring Wesley Andrews to appear in person and show cause why he should not be held in civil contempt for the conduct described herein.

## V. The Court Should Grant *In Rem* Relief Under 11 U.S.C. § 105 to Protect the Properties from Successive Filings.

41.     Section 105(a) authorizes this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code, including orders enjoining successive bad-faith filings affecting specific real property. The Fifth Circuit has long recognized that bad-faith filings of the type presented here warrant equitable relief beyond ordinary stay termination. *In re Little Creek Dev. Co.*, 779 F.2d

1068, 1072 (5th Cir. 1986) ("[E]very bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings."). Where a debtor files a petition not to reorganize but to delay a secured creditor's exercise of state-law remedies while dissipating the creditor's collateral, courts in this Circuit and elsewhere have granted in rem relief under § 105(a) binding on successive filers affecting the same property.

42.     The record demonstrates a scheme to delay, hinder, and defraud Persimmon that warrants *in rem* relief under § 105(a). The Debtor filed the petition on the eve of a long-noticed foreclosure sale scheduled for April 7, 2026, which the Debtor had previously caused to be postponed on multiple occasions through state-court delay tactics. The Debtor used the automatic stay to dissipate more than $1.2 million of Persimmon's cash collateral in twenty-five days, while paying its Managing Member by counter check, its affiliated trucking entity, and pre-petition vendors. The Debtor continued the unauthorized disbursements after the April 20 Denial Order made clear that no interim authority existed. The Debtor made affirmative misrepresentations to this Court regarding the function of Cadence account #9181 as a payroll account, concealed approximately $160,000 in pre-petition insider distributions from its Statement of Financial Affairs, and has refused to identify the destination of $108,306.14 in diverted "PAYROLL" ACH debits. This is not a good-faith reorganization effort; it is a delay-and-dissipate scheme of precisely the kind that § 105(a) *in rem* relief was designed to prevent.

43.     Persimmon respectfully requests that the Order entered on this Motion (i) include specific findings regarding the bad-faith filing and the scheme to delay, hinder, and defraud Persimmon; (ii) grant *in rem* relief from the automatic stay with respect to the

Properties under § 105(a) and the Court's inherent power; (iii) be binding in any bankruptcy case purporting to affect the Properties that is filed within two (2) years of entry, upon recordation in compliance with applicable Texas law; and (iv) authorize Persimmon to record a certified copy of the Order in the Official Public Records of McCulloch County, Texas, so that the in rem relief is effective against any subsequent filer and any subsequent transferee of the Properties.

## VI. Dismissal Is the Preferred Outcome.

44.     Section 1112(b)(1) requires the Court to choose between dismissal and conversion based on the best interests of creditors and the estate. Dismissal is preferred here for three reasons.

45.     First, this is a two-party dispute. The Debtor's bankruptcy filing was timed to delay Persimmon's long-noticed foreclosure sale set for April 7, 2026. Dismissal would lift the automatic stay and permit Persimmon to proceed with foreclosure — the relief the filing was intended to delay.

46.     Second, the estate has been depleted. A chapter 7 trustee would inherit a diminished estate with significant administrative claims and limited prospects for meaningful unsecured distribution. The most efficient and value-maximizing outcome for the estate is to permit the secured creditor to exercise its state-law remedies.

47.     Third, the Debtor's entire business is the extraction and sale of aggregate and sand from the Properties, which are Persimmon's collateral. The Debtor has no going-concern value independent of the Properties.

**VII. The § 1112(b)(2) Exception Does Not Apply.**

48.     Once cause is established, the Debtor bears the burden of demonstrating the § 1112(b)(2) exception by showing (a) identified unusual circumstances establishing that dismissal or conversion is not in the best interests of creditors; (b) a reasonable likelihood of plan confirmation; (c) reasonable justification for the acts or omissions constituting cause; and (d) cure within a reasonable time. The Debtor cannot meet this burden. There is no reasonable justification for continuing unauthorized disbursements after the entry of the orders cited herein, including the April 20 Denial Order, for paying insiders by counter check, for diverting payroll ACH debits to an undisclosed destination, or for falsely representing the use of #9181 as the payroll account. The dissipation of cash collateral cannot be cured—the cash is gone.

## PRAYER FOR RELIEF

WHEREFORE, Persimmon BridgeCo, LLC respectfully requests that the Court enter an order:

(a) IMPOSING SANCTIONS under 11 U.S.C. § 105(a) and the Court's inherent power for the Debtor's violations of the DIP Order [Dkt. 4], the Wages Order [Dkt. 8], the April 20 Denial Order [Dkt. 15], the Interim CC Order [Dkt. No. 47], the Interim CV Order [Dkt. No. 46], and the Utility Order [Dkt. 24], including (i) disgorgement of the unauthorized transfers identified in Section III above; (ii) per-diem coercive monetary sanctions against the Debtor and Wesley Andrews personally for continued non-compliance; (iii) Persimmon's reasonable attorney's fees and costs payable from estate assets and, jointly and severally,

from Mr. Andrews personally; and (iv) an order requiring Wesley Andrews to appear in person and show cause why he should not be held in civil contempt;

(b) DISMISSING this chapter 11 case under 11 U.S.C. § 1112(b), with a one-year bar to refiling by the Debtor under 11 U.S.C. §§ 105(a) and 349(a), with an alternative 180-day bar should any reviewing court conclude that one year exceeds the Court's discretion;

(c) GRANTING *in rem* relief from the automatic stay with respect to the Properties pursuant to 11 U.S.C. § 105(a) and the Court's inherent power, binding in any bankruptcy case purporting to affect the Properties that is filed within two years of entry of the order, upon recordation in compliance with applicable Texas law, and authorizing Persimmon to record a certified copy of the order in the Official Public Records of McCulloch County, Texas;

(d) In the alternative, CONVERTING this case to chapter 7 under 11 U.S.C. § 1112(b);

(e) In the further alternative, APPOINTING a chapter 11 trustee under 11 U.S.C. § 1104(a);

(f) Pending the hearing, PROHIBITING the Debtor from making any further disbursements other than for ordinary-course operating expenses set forth in a budget approved in writing by Persimmon;

(g) ORDERING the Debtor to identify, within seven (7) days, the recipient of the $108,306.14 in ACH debits labeled "PAYROLL" bearing originator 1884064394, including the third-party payroll processor through which those

funds were routed and the destination account at that processor or its receiving bank;

(h) RETAINING JURISDICTION post-dismissal to interpret, implement, and enforce the order, to hear any contempt or enforcement proceeding, to hear any motion to transfer venue to this Court of any subsequent bankruptcy case affecting the Properties under 28 U.S.C. § 1412 and Federal Rule of Bankruptcy Procedure 1014, and to hear any related matter; and

(i) GRANTING such other and further relief to which Persimmon may be justly entitled.

Respectfully submitted,

**GRABLE MARTIN PLLC**

/s/ Mary Elizabeth Heard
**MARY ELIZABETH HEARD**
Texas State Bar No. 24096727
SD # 2943737
Email:
meheard@grablemartin.com
Grable Martin PLLC
7700 Broadway St., Ste. 104
PMB 308
San Antonio, Texas 78209
Telephone: (210) 572-4925

*Counsel for Persimmon BridgeCo, LLC*

**CERTIFICATE OF CONFERENCE**

I hereby certify that I sent an email on May 12, 2026, to counsel for the Debtors, Erin Jones and Chris Murray asking if they opposed emergency consideration of the Motion. I did not receive a response as of the filing of this Motion.

*/s/ Mary Elizabeth Heard*
Mary Elizabeth Heard

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served on May 17, 2026, via the Court's electronic case filing (ECF) system on all parties receiving ECF notices in this case and via email on the following parties at their respective email addresses.

Chris Murray, Counsel for Debtor, chris@jonesmurray.com

Erin Jones, Counsel for Debtor, erin.jones@jonesmurray.com

Vianey Garza, US Trustee, vianey.garza@usdoj.gov

*/s/ Mary Elizabeth Heard*
Mary Elizabeth Heard